**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § § | |
| **Inca Boot Company, LLC,**[1] | § § | Case No. 25-11382-smr |
|    d/b/a Fortress Shoes, | § | |
|    f/d/b/a Fortress of Inca, | § § | Chapter 11, Subchapter V |
|              **Debtor.** | § | |

**DEBTOR'S BRIEF IN SUPPORT OF CONFIRMATION OF
SUBCHAPTER V DEBTOR'S PLAN DATED DECEMBER 3, 2025**

The Debtor submits these responses to the Subchapter V Trustee's limited objections to the *Subchapter V Debtor's Plan Dated December 3, 2025* [Dkt. 46] (the "Plan").

## Background

1. The Debtor is an Austin-based company that sells high-quality, handcrafted footwear made by family-owned and operated workshops and factories in Peru. On September 4, 2025 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11, Subchapter V.

2. On December 3, 2025, the Debtor filed its Plan, under which the Debtor will reorganize its debts, continue operations, and (as the Disbursing Agent) make payments to two impaired classes of creditors:

- Class 1 (secured claims): The Debtor's senior secured lender is the U.S. Small Business Administration (the "SBA"), whose claim is undersecured and therefore bifurcated pursuant to 11 U.S.C. § 506(a) into a secured portion equal to the value of its collateral (in Class 1) and an unsecured deficiency claim (in Class 2).

---

[1] The Debtor's federal Employer Identification Number (EIN) is 27-2552155.

1

> The SBA will be paid in full in monthly installments over sixty months, at the contractual interest rate of 3.75%.
>
> - Class 2 (unsecured claims): Unsecured claims, including the deficiency claims of the SBA and the Debtor's other secured creditors, will receive six semi-annual pro rata payments from the Debtor's projected disposable income over the three-year period following confirmation. The distributions represent a 4.80% recovery, which exceeds the 0% recovery that unsecured creditors would receive under a hypothetical chapter 7 liquidation.

3. The only ballot received by the Debtor was submitted by a Class 2 creditor, who voted to accept the Plan.[2] Because not all impaired classes accepted the Plan, the Debtor submitted a Proposed Confirmation Order[3] that would confirm the Plan as a nonconsensual plan under 11 U.S.C. § 1191(b).

4. The only objections to the Plan were limited objections from the Subchapter V Trustee,[4] who seeks additional explanation regarding the Debtor's projected revenue, expenses, and disposable income. The Subchapter V Trustee indicated no objection to the Debtor acting as the Disbursing Agent, provided the Debtor submit periodic post-petition reporting to the Subchapter V Trustee, as described in Section 6.3 of the Plan.

---

[2] *See* Ballot Summary, Dkt. 56.
[3] Dkt. 57.
[4] Sub V Trustee's Report, Dkt. 55.

**Responses to Limited Objections**

I. **The Debtor's business is cyclical, with positive net income during the August–January period making up for negative net income during the February–July period.**

5. The Projected Financial Information attached as <u>Exhibit B</u> to the Plan reflects projections for six-month periods during the three-year Plan period: February 1 through July 31 ("<u>Feb-July</u>") and August 1 through January 31 ("<u>Aug-Jan</u>"). Feb-July projections differ from Aug-Jan projections due to seasonal factors affecting the footwear market.

6. The Aug-Jan period is typically a stronger season, as customers' purchases include fall boots, holiday outfits, and weather-driven replacements. The Aug-Jan period also includes back-to-school shopping and holiday gift purchases. By contrast, the Feb-July period skews more towards sandals and casual styles, which are often lower-priced and purchased with less urgency. The Feb-July period also contends with post-holiday budget fatigue and travel spending competing for dollars.

7. During the slower Feb-July periods, although some costs are lower (*e.g.*, production, shipping, advertising), other costs remain fixed (*e.g.*, storage, software, salaries), which results in a negative projected disposable income during the Feb-July periods. However, the positive projected disposable incomes during the corresponding Aug-Jan period are of a larger magnitude and result in a positive projected disposable income over the full year—even for the first Feb-July period, which includes payment of the Debtor's counsel fees and expenses during the bankruptcy case.

3

8. Therefore, comparing the Debtor's post-petition performance between September 2025 and November 2025 to the Debtor's projections for February 2026 through July 2026 is not an apples-to-apples comparison. Instead, comparing that same post-petition period (averaging $58,352.38 per month) with the Debtor's projections for August 2026 through January 2027 (averaging $62,844.19 per month) reveals consistency in the Debtor's year-over-year projections.

## II. The Plan allows creditors to receive payments even during periods of negative disposable income.

9. The Plan ensures that Class 2 (unsecured) creditors receive some distribution during the Feb-July periods (which have a negative projected disposable income) by making two semi-annual payments that reflect half of the Debtor's projected disposable income for the full year. This approach ensures more consistent cash flow for creditors, avoids large gaps between payments, and demonstrates the Debtor's commitment to steady repayment even during seasonal downturns.

## III. The Debtor's projected post-confirmation revenues and expenses reflect a different environment from the Debtor's pre-petition operations

10. Ongoing economic uncertainty, elevated interest rates, and higher costs of living have resulted in more cautious consumer spending, especially in discretionary categories like women's footwear. At the same time, geopolitical uncertainty has amplified volatility in the Debtor's costs for raw materials and logistics. In short, spending is down while costs are up.

11. Faced with these ongoing challenges, the Debtor's Plan reflects a transition away from a previously aggressive growth strategy, which relied heavily

on borrowing to fund operations and proved unsustainable, to a more disciplined approach, which focuses on carefully managing inventory to balance demand fulfillment with financial efficiency, increasing marketing spend to support targeted customer acquisition and retention efforts, and streamlining operating costs to strengthen profitability and reduce financial risk. Although certain costs are increased under this approach, these investments are targeted to support sustainable growth and improve operational efficiency. The higher upfront costs will enhance financial stability, reduce risk, and position the Debtor for consistent, profitable growth.

## **Conclusion**

The Debtor respectfully requests that the Court overrule the Subchapter V Trustee's limited objections and enter an order confirming the Plan as a nonconsensual plan under 11 U.S.C. § 1191(b).

Date: January 26, 2026　　　　　　　　　　　　**Nguyen Law, PLLC**

　　　　　　　　　　　　　　　　　　　　　　　*/s/ An Nguyen*
　　　　　　　　　　　　　　　　　　　　　　An Nguyen, Esq.
　　　　　　　　　　　　　　　　　　　　　　Texas Bar No. 24118479
　　　　　　　　　　　　　　　　　　　　　　P.O. Box 150146
　　　　　　　　　　　　　　　　　　　　　　Austin, TX 78715-0146
　　　　　　　　　　　　　　　　　　　　　　(512) 712-3484
　　　　　　　　　　　　　　　　　　　　　　an@anwinlaw.com

　　　　　　　　　　　　　　　　　　　　　　*Counsel to the Debtor and*
　　　　　　　　　　　　　　　　　　　　　　*Debtor-in-Possession*

## Certificate of Service

      The undersigned hereby certifies that, on January 26, 2026, true and correct copies of the foregoing document were served by electronically filing the same with the Court using the Court's CM/ECF system, which sent notification to the parties receiving same through such system.

                                                */s/ An Nguyen*
                                                An Nguyen